We'll hear argument first this morning in Case No. 15-1485, the District of Columbia v. Wesby. Mr. Kim. Mr. Chief Justice, and may it please the Court, probable cause is a practical standard, and thus it accounts for the practical limitations that officers face when making arrest decisions, including their inability to look directly into the minds of suspects, offering innocent explanations for suspicious conduct. And so, in a case like this one, with the actus reus established, and circumstantial evidence of mens rea that is strong or at least fair, arrest is reasonable and hence constitutional, and more clearly, qualified immunity applies. Let's turn to the totality of the circumstances and consider them from the correct perspective. Ginsburg. Mr. Kim, before you do that, could you clarify the other charges that are in this case, the one relating to disorderly conduct and negligent supervision? Where do they stand, and are they in any way affected by the argument you're making today? We do not pursue an argument that probable cause existed for disorderly conduct as to negligent supervision. That common law claim fails if there was either probable cause or qualified immunity. That's where they stand, Your Honor. If I may turn back to the totality of the circumstances, my clients responded to neighbors' complaints about the fact that there was a probable cause. Sotomayor, I'm not sure I understood what you just said. Whether we hold on qualified immunity grounds or probable cause grounds, I don't think it affects those claims, does it? No, that's right, Your Honor. So why would our finding of probable cause affect it? I think those stand on their own, don't they? No, Your Honor. If there was probable cause, the negligent supervision would fail as a matter of law. That was undisputed in the courts below, and it's undisputed in this Court. Well, we'll let your adversary answer that. Thank you, Your Honor. So my clients responded to neighbors' complaints about illegal activities in a house in their residential community that was supposed to be vacant. They found a group of late-night partiers, none of whom claimed any right over the home. The homeowner, Mr. Hughes, confirmed. I'm sorry. Why isn't there a right? Someone invites me into what they claim is their home or their place of living. Isn't that an invitation? Yes, there was a claim of invitation, Your Honor. I was referring to the absence of any claim of any property right over the home. But, yes, there was a claim of invitation. But I don't have a property right when I get invited into someone's home. To be sure, Your Honor. I don't ask to look at their lease. I don't ask to – for them to establish to my satisfaction or anyone else's their right to be there. I assume if they're there, they can invite me in. Your Honor, we're not suggesting that there has to be some type of confirmation by any party guest of the inviter's right to invite. What we're saying instead is from the officer's perspective, looking at the totality of the circumstances, there was a fair probability that Respondents were trespassing either knowingly or negligently. This is not about whether or not a party goer needs to confirm an invitation. This is from the officer's perspective. If he has the fair probability of guilt necessary to arrest, a prosecutor later can decide whether to press charges. But there was that fair probability here based on the totality of the circumstances. So the homeowner had confirmed no one was supposed to be there. He had not been there to guard against the party goer's entry. And the house appeared vacant. It confirmed the neighbor's tip that it was supposed to be vacant. It was essentially unfurnished and in disarray, and this is a quote from the Arrest Report of JA 112, in disarray in a manner consistent with it being a vacant house. It looked like it was being used just for the party, like no one was living there. This is the type of vacant home that trespassers target. Kagan, just to make sure I understand, Mr. Kim, the tip was a neighbor saying that home is supposed to be vacant, and yet there's a party going on. It's not just a neighbor calling and saying there's a very loud party, it's disturbing my sleep, that the tippy, tipper, that the tipper specifically said it's supposed to be vacant, is that correct? That's correct, Your Honor, it's actually multiple tippers. Multiple tippers, Your Honor, and one of them was an elected official of the District of Columbia. Just how many were there? These were calls to the officers before they went there or when they were there? Yes, Your Honor, before they went there. And how many? We don't know that, Your Honor. We do know that there were calls. But more than one? We do know from the arrest report that multiple people did complain. We don't know if that was before or after the beginning of the investigation, but there were at least some calls before the investigation began. How many people said the house is supposed to be vacant? We know at least two. Two said the house is supposed to be vacant, I see. Okay. Yes, but then when the police actually entered the home, they could see with their own eyes that the house was essentially unfurnished and in disarray in a manner consistent. There were some chairs and mattresses. That's right, Your Honor. Anything else? There were some chairs, there was a mattress. There are open cups of beer and liquor scattered about. Utilities working or not? Utilities were working, Your Honor, it appears, electricity and plumbing. But that's consistent with their continued claim of right by the owner over the home. But he was absent from the home. Trespassers target vacant homes just like this one. And indeed, they sometimes engage in the types of activities that we see here. Was the TIPS anonymous? No, Your Honor. There are names in the arrest report, Your Honor. Okay. I mean, I am told, perhaps I shouldn't take this into account, but compared to the Middle Ages, with which I am more familiar, the people today, younger people frequently say, hey, there's a party at Joe's house. And before you know it, 50 people go to Joe's house. And they all, they don't really ask themselves, does Joe own the house or rent the house or something? It's Joe's house. But the normal assumption would be Joe's house. And nobody questions it. So what's the evidence here that's different from that? Because if I just think that's what happened, hey, there's a party at Joe's house, I would think the people who went over there, whether they knew Joe, heard it secondhand, thirdhand or whatever, are normally, naturally going to think that Joe has a right to the house. Okay. But here, this is different than that because for two reasons. First, if I take your hypothetical correctly, Joe had the authority to throw the party. Breyer, but I'm not talking about Joe's authority. I'm talking about what the partygoers think. Absolutely. When they hear there's a party at, I don't want to repeat myself, I'm saying what I would assume is the normal thought in the partygoer's house is no more than just what I said. There's a party at Joe's house. Let's go. Period. Now, in my mind, that doesn't give any reason whatsoever for thinking that this partygoer suspects, knows or believes that it isn't Joe's house, that he has some right to it. So you, I want you to tell me what's different about this case. Absolutely, Your Honor. What's different about this case are these facts. First, it was a house that was supposed to be vacant and looked vacant. And it was a house where the owner said that no one had permission. It was a house where the purported hosts. Now, put yourself in the mind of the partygoer. The policeman has to be thinking about the partygoer. So one thing is the policeman knows, the policeman knows, and maybe Peaches knows. Call her Joe. It wasn't Joe's house. Now, all right, that's one thing. So I have to ask myself, is that a reason for thinking the partygoer knew it or did anybody think the partygoer knew it? Okay. What's the second? Well, the absence of the supposed host, Joe or Peaches, you can name however you want. The host wasn't even there. The person who supposedly gave me the authority over the house wasn't even there. There were illegal activities happening there, or so the officer's reason could think, of the type typically associated. May I stop you there? Yes, Your Honor. Didn't the person who extended the invitation, Peaches, hadn't she been there and she said she left to go to the store, but she had been there? Your Honor, there was evidence that she told Officer Parker that she had gone to the store. The partygoers themselves did not say that, notably. They simply said in response to the question, where's Peaches, she's not here. Okay. I'm trying to get a full answer, and I have, one, the house looked vacant. Two, that, in fact, Peaches didn't have a right to be in the house. Okay. Anything else? I want to have a complete list of the things that make it different. Yes, Your Honor. Number three, Peaches was not there. Number four, partygoers acted suspiciously in response to the police presence. They fled and hid, and they acted very suspiciously when asked sensible questions like, who's the owner, who lives here? No one answered those questions, according to the depositions. Mr. Sam? And I don't think we should discount the fact that Peaches proved herself to be quite evasive, untrustworthy. She repeatedly hung up on the police when they tried to investigate. She said if she came back to the scene, she would be arrested. And she eventually admitted trespassing herself. Given all the circumstances, the police didn't do anything. That's it, though. That's it. Nothing else. There is more, Your Honor. I could keep on going. The actus reus itself, I think, can be used here as a basis to infer the necessary mens rea. Let's remember, it's either knowledge or negligence. Even assuming that partygoers actually relied upon an invitation from Peaches, and even assuming they actually believed she had the permission to invite them, if their actual reliance was negligent, that nonetheless was criminal trespass in the District of Columbia. So the court of appeals here, in what I think is an impractical approach for what's supposed to be a practical standard, said that the officers basically had to heighten their understanding of the credibility of the partygoers' claim of invitation and Peaches' supposed corroboration. We don't think that's what police officers are required to do on the scene. Suspects on the scene offer any number of different types of innocent explanations for conduct. These will often be false. Police officers need the leeway, the fair leeway. Sotomayor, why weren't any of these partygoers arrested, for example? One among the many officers said he smelled marijuana. But as I understand it, no drugs were found, correct? The evidence is that no drugs were found. That's right, Your Honor. Not marijuana or any other. Why weren't people who were suspected of engaging in sex arrested? Why weren't the people standing around the strippers arrested for those activities if they were illegal? Your Honor, everyone was arrested because the officers believed, and they had probable cause to believe, that everyone in the house had committed the offense of unlawful entry. Specific people in the house may have also committed other crimes, but they weren't charged with those crimes. As far as we know from the record, that's right. But they were not charged with unlawful entry. How many people were in the house? At the time, 21. At the time, 21. Mr. Kim, could you tell me a little bit about how you think the summary judgment posture of this case does or doesn't matter? I mean, usually in summary judgment cases, we say we need to view the facts in the light most favorable to the nonmoving party. And many of these facts, you could see it one way or you could see it another way. It has one explanation or it has another explanation. So how does the summary judgment standard fit with the probable cause standard and also with the qualified immunity standard? How do those three things work together here? Thank you, Your Honor. I think the essential facts were undisputed until Respondent's brief on the merits. Their attempts to dispute those facts come too late for reasons I'm happy to discuss. The inferences to be drawn from those established facts are for the court and probable cause to be determined as a matter of law. The court puts itself in the shoes of the officer and thinks, was it reasonable for the officer to arrest based on these facts? And, of course, if there are inferences drawn from the police officers, the court will defer to those inferences. Roberts. Roberts. You said you were happy to discuss the reasons that the disputed facts come too late. What are those? Because it was inappropriate for the Respondents to wait, even in their cert papers, to raise these disputes. And it's inappropriate for them to ask this Court to be the first court to parse the record closely to consider these claims of dispute. These disputes were not. Why would they be asking that? I mean, one thing is their motion for summary judgment, which was successful. But why would you be entitled to summary judgment in view of the disputed facts that they claim now? Because, Your Honor, their disputes are waived or forfeited. They should have been raised before, and especially in the brief in opposition, before this Court decided in its discretion to grant cert on the two questions presented. Moreover, I would note that even if you took the facts that are undisputed even now and added them to the facts stated directly in the questions presented, that would be sufficient to establish probable cause as a matter of law. No matter how you would want to take the inferences in the light most favorable to the Respondents, it wouldn't matter here, because, again, the inferences are for the Court, and the established facts establish probable cause. Roberts, So they didn't dispute the central facts in their brief in opposition, the facts that were laid out in the petition for cert? That's right, Your Honor. In fact, they affirmatively agreed to what we think is the most central fact. The first sentence in the brief in opposition says that this case is about, among other things, what happens when the owner has indicated to the police that he has not given permission. They now attempt to dispute that, and it's too late for them to do so, Your Honor. So if you actually look at the totality of the circumstances and you allow the officers to use their common sense, this Court has said that this is a commonsensical standard, a readily available inference for a reasonable officer was that the party was dupes, tricked into someone else's house, but the simpler explanation, they were trespassing to throw a party with drugs and strippers in a place where they thought they wouldn't be caught. They weren't charged with trespass, unlawful entry, were they? They were, Your Honor. Unlawful entry was the charge. I thought that that charge was not made once they were at the police station. Instead, they were charged with disorderly conduct. That's correct. The arresting officers, though, indicated that the reason for the arrest was unlawful entry. And the fact that it was changed. And it wasn't that because when their superior was on the scene and determined that the owner had not leased the house to anyone, he thought that that was sufficient to arrest. Well, yes, Your Honor. That appears to be Sergeant Suber's subjective reasoning. Of course, probable cause is an objective analysis. I see my time is almost up. I would like to say one word about qualified immunity. I would hope that the debate today and the fact that four judges on the D.C. Circuit thought there was probable cause would be enough to establish that this constitutional question was not beyond debate. I'll reserve the rest of my time. Roberts. Thank you, counsel. Thank you, counsel. Mr. Parker. Mr. Chief Justice, and may it please the Court. There are two fundamental errors in the way that the lower courts analyzed the question of probable cause in this case. First, they took certain important facts out of context, viewed them in isolation, and engaged in precisely the sort of divide-and-conquer analysis that this Court has said is inappropriate. And the second is, they concluded that because those facts were susceptible to possible innocent explanations, they could not contribute to a finding of probable cause. Neither of those is correct. When police officers encounter a criminal suspect, they are required to draw fair inferences from the entire constellation of facts, drawing on practical and common sense experience. Those facts will rarely be clear, and often they will point in different directions. And when they do, this Court has said repeatedly that the possibility of competing inferences supports, not undermines, a finding of probable cause. That is especially true in the case of Menz Rhea, which is not directly knowable. The police officer cannot peer into the head of the criminal suspect and know exactly what he or she is thinking. And just like juries and judges must rely on all of the surrounding circumstances to infer what the mental state is, certainly police officers should be permitted to do so under the less exacting requirements of probable cause. This case presents a very good example of why these principles are appropriate. And I want to be very clear at the outset what we are not saying. We are not saying that no one can accept a secondhand invitation to a party, or that they cannot go to a party at the home of somebody they don't know, or that when they arrive, they have to inspect the lease to ensure that the person has authority to invite them. All we are saying is that if a person finds himself or herself in a compromising situation, here, finding themselves in a vacant home that actually is vacant, and where they, as a matter of fact, are an intruder who is committing the actus reus of a crime, and especially if there are surrounding circumstances that would lead a reasonable observer to think that that may be what really is going on, then the deck is stacked against that person. Breyer. You are saying that any time a policeman goes into a house and there's a party and people tell you, somebody invited me, and it turns out that that somebody didn't have a right to be in the house, you can arrest them? No, I'm not saying that. You're not? No. Then what else is there here than that? Oh, sorry. There is one other thing. The other thing is that it's sparsely furnished. So whenever you see a sparsely furnished house with some people in it, and they say word got around that Joe invited everybody to his house for a party, it turns out that Joe hadn't rented the house, you can arrest him. Isn't that what you're saying? It is not what I'm saying. Okay. Then why isn't it? Well, because there are two answers. One is, that I think would be precisely the kind of bright-line rule that this Court has repeatedly said is not to be imposed in probable cause cases. What I think instead is required is an analysis of the totality of the circumstances to determine whether the statement of a or the claim of an innocent mental statement is. I'm saying what else is there here, and I don't see anything else, and maybe it's a question of believability, then let's have a trial. Well, let me talk about the facts of this case, if I could turn to that. I think it's useful to think of this almost as like two sides of a ledger. On one side, there's the condition of the home. On the other side, there's the statements of the people who were there. If you think about the condition of the home, the police were responding to a citizen complaint, multiple citizen complaints, that this was a vacant home. Not only was it a vacant home, but they said that it had been repeatedly exploited to throw parties in the past. Ginsburg. But the story of the Peaches who extended the invitation was that she had just leased the house. So if somebody had just leased the house, the sparse furnishing would not be at all incriminating. I think that that is a perfectly permissible inference from the facts that you described, Justice Ginsburg. I think our only point is it is not the only permissible inference based on the totality of the facts here. In addition to the tip that they received when the officers arrived, they noticed that the condition of the home was entirely consistent with being a vacant house. It wasn't just that it was sparsely furnished. It had folding chairs and a mattress. It was also described as being in a state of disarray consistent with being a vacant  It wasn't just that it was messy. Sotomayor, what was that? If all it had, according to you, was a bed and some folding chairs and utilities that worked, nothing had been turned off, what happens during a party? Disarray. So what was different in this disarray from a party? Well, the evidence in the record indicates that the house was considerably more dirty than just an ordinary house. In fact, one of the individuals who went to the house said that the floor was so dirty she was unwilling to sit on it. There was trash strewn about. There were used contraceptives strewn about. I think that all of those things would lead a reasonable officer to think that perhaps these are just particularly messy houseguests, but this is also consistent with the type of party people would throw in a vacant house where they're not too concerned about the state that they leave it in. Kagan. Yes. Kagan. You know, you're exactly right, that of course we have to view this through the eyes of the officer. And there is much that an officer could look at here and say, I think I have probable cause, and certainly when the qualified immunity standard is laid on top of that makes it even easier for the officer. I guess one of the things that strikes me is why there is resistance here, is that when looked at from the point of view of the reasonable partygoer, it looks a little bit different. And I take the point that that's not the standard, but we are setting rules, and those rules are going to affect how police officers act in the future as well. And when looked at from the reasonable partygoer's view, there are these parties that once long ago I used to be invited to, where you didn't don't know the host, but you know Joe is having a party. And can I say that long, long ago marijuana was maybe present at those parties? And you know, so and you know, it just is not obvious that the reasonable partygoer is supposed to walk into this apartment and say, got to get out of here. And it seems a little bit hard that they are subject to arrest. So how do I think about that question? Well, I think there are a couple of ways. I think the overarching point here is that, as I said, when a partygoer goes to a house, if it turns out that it actually is vacant and that they actually are intruding, the police, upon encountering that situation. Right. But they don't know that, as I said. That's right. I mean, from the partygoer's point of view, they just know that Joe is having a big time, and maybe there will be some liquor, and maybe there will be some recreational drugs, and they're having a good time. I think that that's an entirely possible inference to draw, but it's not the only inference. And I think here there are a number of facts that suggest that that, in fact, was not what was happening. It's not just that the house looked vacant and that people who were reasonably on the scene would be able to observe that this looks like a situation where we should not be. It's that when they were asked about it, the individuals said nothing to dispel probable cause. If anything, they reinforced it. It wasn't just that none of them lived there. None of them knew who lived there. They also, when asked who invited you, almost all of them said somebody else. The record doesn't reflect whether they named any particular person, but we do know that only two of the individuals on the scene, it appears at least, named Peaches, and those were two of the young women who had been hired to come dance at this party. They were not the actual partygoers themselves. When Peaches was called, she, as Mr. Kim explained earlier, was evasive. She lied to the officers. She said that she had authority to throw a party there, and she didn't. All of those things, I think, would fit into a reasonable officer's understanding of the facts and suggest that they may be hearing a story that is not true, both from the partygoers and from Peaches. And certainly, I think that when police arrive at a scene and see the actus reius of a crime in the process of being committed, they can at least reasonably intuit that the people here probably know what they're doing. That isn't always going to be able to get you over the probable cause hump, because, as I've said, this is not an area susceptible to those sorts of bright-line rules, but at least it's going to inform what a prudent officer who is exercising an appropriate level of skepticism when dealing with these sorts of people would think. Thank you. Roberts Thank you, counsel. Mr. Garrett. Garrett, Mr. Chief Justice, and may it please the Court. The Court should affirm the grant of Respondent's summary judgment motion. Respondents uniformly told police they had been invited to a party. The host corroborated their statements, and the owner of the house confirmed the host was not some stranger. She had been involved in lease negotiations that ultimately fell through. Petitioners now maintain that there was probable cause to arrest because the party was raucous and involved stripping and drinking and marijuana smoke. But those activities don't put a partygoer on notice that the host has failed. Roberts Well, there was a lot more involved that the Petitioner is relying on than those things that you just listed. He went through six different items that weren't limited to the fact that it was a raucous party. Garrett So there was also the fact that Peaches was absent. Justice Ginsburg, you are correct that Peaches was at the party. That's undisputed at JA43. Then they arrive and she has left. Does a partygoer who arrives at a party where the host is there and then she leaves? No. He should not be there after she was there when he arrived. They also mentioned disarray and the status of the home. I think, in fact, the status of the home is generally undisputed in terms of what was there, and many things were left out, so let me explain them. The bed, the chairs, which were not folding chairs. You can see that from the pictures in the record. The stereo, the utilities were on. Somebody was paying the utility bills. There were candles. There was food in the refrigerator. There were window coverings. There was shower curtains. So they say it was vacant, but it's certainly not vacant under the definition of D.C. law. D.C. law defines vacant. It certainly wasn't vacant. So they must mean, well, when the people arrived, the condition of the house was such that they should have realized they're not supposed to be there. Roberts. Does it matter that the tips they had said that it was vacant? Well, the tip – I think the tip is hard to sort of decipher. We've got the police report at 112 where there are two tipsters named Keck and Foster, and we don't know who exactly said what because it doesn't distinguish between them. Three pieces of information given, vacant, illegal activity, loud music. Oddly, Mr. Keck comes in at summary judgment and files an affidavit that seems quite different from that. He actually says it used to be vacant. About a month ago, I started seeing people using the house. The important thing, I suppose, would be what the officers were told and whether it was reasonable for them to act on what they were told. And it certainly was reasonable for them to act, Chief Justice Roberts. We don't dispute, and this is what the Petitioners maintained in the district court, certainly at that point when the tip comes in, they have suspicion. They can go to the house, investigate what's going on, which they did. The question is then what develops into probable cause for unlawful entry, and most importantly, what is the evidence that these individuals knew that they weren't supposed to be here or at least were negligent in not knowing that? Alito, what should the officers have done after they had made all their inquiries at the house? I think there's several things they could have done here, Justice Alito. Number one, they now had information from the owner that he didn't want them there. They immediately could have asked the individuals or ordered the individuals to leave, and if they hadn't, that's unlawful entry. They could arrest. They could have issued a citation for disorderly conduct, which likely would not have raised Fourth Amendment concerns at all. They could have investigated, as they now maintain they smelled marijuana smoke. There's a suggestion that one officer heard about prostitution. Well, they certainly could have investigated those crimes. I think it's interesting, or at least telling, that under Devenpeck, they could have come in here at any time and say, we arrested for unlawful entry, but really we had probable cause for other things, whether it's disorderly conduct, marijuana, narcotics, prostitution. They've abandoned the disorderly conduct justification, and they've never suggested they had probable cause to arrest anybody for the other crimes. And I think the key things that I haven't fully taken in, one, you put yourself in the position of the officer. Two people tell you this is a vacant house. It is known, i.e., they knew, I guess there's some evidence of this, that there were vacant houses in this area used for parties. They know also that it is a vacant house, and it doesn't – and those are the things that – and then they look around and it looks sort of vacant, not completely, but sort of. And so that together leads them to think, well, these people knew it was a vacant house, and would a reasonable officer have concluded that the party goers knew or they knew it was a vacant house? If so, that's enough, because it is trespass to go into a vacant house, I gather. No, it's not, Your Honor. It's not. Well, vacant – but the other stuff they have, I guess, isn't it? You can't – it isn't trespass in the District of Columbia to go into a vacant house. No, it's not, Your Honor. In fact, if a house is – Go ahead. Well, if a house is actually – I mean, this is the oddity of how this argument comes up. If a house is actually vacant or abandoned, it's not trespassing, because somebody is not maintaining their control over it. It's – it is prima facie evidence of trespass if somebody is in a vacant house that is boarded up or otherwise secured in a manner that conveys it's not to be entered. I think one fact that was not talked about here is that there was no evidence of boarding up, and there's no evidence of forced entry.  Sotomayor, you were referring to the technicalities of District of Columbia law, don't you think they meant that nobody was living there? That's correct, Your Honor. I do think that's right. And then the question arises, these partygoers, did they have reason or did they know that it was supposed to be vacant? Now, the host had told both – she told the partygoers she had just moved in. The police actually knew this, because Peaches told Sergeant Suber the owner is supposed to be fixing the house up for me. We've also – obviously in a low-income neighborhood. So our point on the status of the home is that a partygoer going to the home would not infer, simply because of its condition, there must be something wrong with the host's title. Well, the fact that what you just mentioned is troubling to me. You say it's a low-income neighborhood. And I just wonder, if we moved all of these facts to an affluent community, and what the neighbors said when they called the police is, you know, our neighbor Joe, who is the CEO of this and that company, has been – or an officer in a big company has been transferred to another city and has moved out, and the house is unoccupied, would you be making the same argument? Well, it depends on what the party looks like. It certainly – It looks exactly like this party. Well, then I think the police need to invest – no, I think the police – if the house is completely – The facts are exactly the same, except the party is in Potomac. Well, I think it would be a closer case, but I – Why wouldn't it be a closer case? Because the expectation – well, this is a low-income neighborhood. We don't care what goes on here? Oh, quite the opposite. The point is that the – we're looking at this from a police officer's common sense perspective. And certainly it seems like common sense that if you're in River Terrace, the condition – the fact that the home doesn't look the same as it might in Northwest D.C. is something the police ought to take into consideration. I – In fact, and this is important to me, I'm sorry that it is, I didn't know this. In fact, the house under D.C. law wasn't vacant. No, Your Honor. And indeed, if the officers, which is unlikely, had known all these details, they would have known it's not vacant. What it is, is not owned by or rented by the person who supposedly invited them to the party. Correct. So then the question becomes, did – would a reasonable officer have believed that they were trespassing, and they were trespassing if and only if there is some reason, a reasonable person could have believed that they knew that the person who invited them first, second or third hand did not have a right to be there? Correct. And there's – you think there's nothing to have a trial about? Oh, I – well, so let me – let me maybe use that question as a transition to Justice Kagan's question about the differing standards of review and the different motions. So both parties filed motions for summary judgment, and I want to also make sure I talk about the waiver issue. So if the court is reviewing our motion and asking whether to reverse that motion, the facts are construed in the district's favor. If the court is reviewing should it direct entry of judgment for Petitioners, then you would construe the facts in our favor. Now, there was some discussion of, well, have we waived this distinction, and let me explain why that's not the case. In their petition, the Petitioners asked for reversal of liability findings at pages 16 and 25, and they construed the facts in their favor. It wasn't until their merits brief that they very clearly said, not only should you reverse their motion, you should grant ours. They also say, well, you never disputed some of these facts below. Well, I encourage the Court to look at JA-186, which is their 56.1 statement in support of summary judgment. They never mention five of the seven facts they rely on here. Roberts But they did mention them in their petition, and our rule, Rule 15, makes it perfectly clear. If you do not challenge the factual assertions in the petition, you are bound by those assertions. The reason is that we make a judgment about whether to take a case based on the cert papers, and we take the facts as set forth in the petition, if not challenged in the brief in opposition. And I went through and read your brief in opposition again, and you did not challenge – in fact, you conceded most of the pertinent facts on which Mr. Kim has relied. Burschegger Because we can't challenge them when we're viewing our motion for summary judgment. Roberts No, no. These are historical facts that they asserted. It doesn't matter the motion this, the motion that. They said the different things. The police received a phone tip. Peaches recanted her claim. And in many of those, you agreed. You repeated their assertions. And on others, you didn't challenge them. Burschegger Again, I'm not sure I have much to add, other than if the question is whether we're reviewing our motion, we do take those facts as true. But they clearly, Petitioners clearly know how to say we want a directed judgment in our favor, and they didn't ask for it in the petition. And my point is simply, I think it ought to be at least unambiguous, if they're going to change relief in their merits brief, they ought to have made that clear at the petition stage, because there are two different motions and you don't necessarily enter summary judgment for them, even if the Court's inclined to reverse our motion. Roberts Well, but I do think, again, under our rules, in reviewing either motion, you take the facts as they asserted in the petition that you either accepted or did not rebut. And we don't dispute those facts in the context of our motion. And I would also note the cases they're relying on are cases where the facts end up mooting, the waiver cases end up mooting the legal question. We're not asking to moot any legal question. The point is they've now extended in their merits brief the scope of this case from our motion to their motion, and so we're responding to that. And as I was saying earlier, the reason these facts weren't disputed below is because in the district court, Petitioner's theory was that this was a summary, a strict liability crime. And so they didn't rely on anything having to do with facts that would have put Respondents on notice, because their position was that's irrelevant. As soon as we talk to the owner and he says you're not allowed to be here, game over, they're liable for trespass. So it's now that they're actually asking the Court to enter judgment on a different summary judgment motion than the one they actually filed in the district court. One might ask what other evidence they could have looked for. One of Justice Alito asked what else could they have done. One might also ask what else could the police have looked for as evidence of mens rea. And I think looking at the cases cited in this case, you see a number of examples that were absent here. One is direct evidence, which you see in several cases like Kozlowska, where the owner tells police these individuals knew they weren't supposed to be in the house. We don't have that. There's circumstantial evidence like forced entry, where somebody has to force their way into the house because it's not theirs and they're trying to get into a house. Here, of course, the evidence, as it turned out, is that the host had keys. And so there was no forced entry. They were not ---- Ginsburg. Here we've been talking about probable cause up until now. But there's also the qualified immunity question. And this Court has said that there's no liability on the part of the officer unless he or she knowingly violated the law or was plainly incompetent. So can you explain how you crossed that hurdle? Yes. Yes, Justice Ginsburg. Our position is that these officers were plainly incompetent in disregarding evidence of the partygoer's state of mind. It's not a subjective standard. Nonetheless, multiple officers testified. They witnessed nothing that would have put these partygoers on notice that they weren't supposed to be here, which I think speaks to what an objectively reasonable officer would have believed. Of course, they arrested because they believed it was a strict liability crime. And our contention is that the facts that have been mentioned, flight, which I do want to address, drugs, prostitution, our point is that none of this is evidence of the mens rea element. Well, Mr. Garrett, as you say, it is an objective standard. And there are all these cases in the District of Columbia. Tillman is the one that gets the most emphasis in the briefs, but there are others, right? There is this Artis, Smith, McGloin, Bowman, and all of these cases, which are D.C. court cases, say they upheld convictions. They upheld convictions for trespass even though the person gave some excuse about how they didn't know or they didn't or they shouldn't, they had no reason to know that they were there. And I'm just wondering, you're a D.C. police officer, and there are all these cases that say, you know, we're going to uphold convictions even though people like the party goers here have to get up on the stand and say, this is why I thought I had a right to be here. And, you know, what is a police officer supposed to make of all that law? Well, I think what they make of that law, and I want to make one clarification, Tillman is not actually an unlawful entry statute. It was a different statute. But I think what they make of that is where somebody enters a residence where the will of the owner has been expressed, you don't have to accept a suspect's explanation. In Artis, there was a sign saying you must register. He didn't register. In McGloin, he was in an obviously restricted area. Tillman, I think, is a different case because that is a case where the crime was knowingly entering the paid area of a metro station, and the reasoning was you walked past the tills, you walked through a door, we can infer from the act itself that you knew what you were doing. But, again, the difference, I think, is in all those cases, there's a sign, there's some indication that puts these suspects on notice, I'm not supposed to be here. And that, I think, is sort of the difference in this case. We're obviously arguing about what were the inferences they could have drawn from things like stripping and marijuana, but it's certainly very different than a sign outside a building saying don't come in here unless you register. Roberts. Did I understand you to suggest that the officer should have done more by way of investigation before arresting the party-goers? Well, I was asked what else could they have done. If they wanted to arrest for other crimes, they certainly should have. If they wanted to arrest for unlawful entry, yes. I think if you're going to conduct a mass arrest of 21 individuals, you require some individualized suspicion. So I do think that's clear. I thought I recalled from the Petitioner's brief that the police interviewed every one of the people at the party. Well, I don't think that's clear. Petitioners say in their summary judgment papers that everyone said they were invited to a bachelor party, so I suppose you could infer from that they talked to everybody. But what the summary judgment record actually shows is specific officers saying I talked to a handful of people. How many officers were there? Ten to 15. What they certainly never asked about, Your Honor, was evidence that might bear on what these individuals knew. Have you ever been to this house before? How do you know the host? Who invited you and what did you know about? I thought the record established, well, Mr. Kim represented, that of the 21, 19 people could not identify the person who invited them. That's not accurate, Your Honor. And I don't, but to be fair, I don't think that was the representation. I think the representation was that we have limited depositions that were used as summary judgment. There are two depositions where the person states who invited them, and in both cases they state it was the hostess. Now, there's this is the statement is in the 56.1, or that Officer Campanelli says I talked to several other individuals. This is JA 135. I talked to several other individuals and they were not invited by the host. Roberts. Roberts. I don't recall. Does the petition say anything about whether the police interviewed everyone at the party? I don't recall. I'm sorry. I do want to talk just briefly about the imputation point. Again, the they're not Petitioners aren't seeking to justify the arrest of 21 individuals on the basis of individualized suspicion. There's been a reliance on Pringle and the common and imputing mens rea from one to the other. I just want to make sure I touch on that, because I think Pringle is a very different case from this case. In Pringle, there were three individuals at a car at 3 in the morning, and the court reasoned that one person was certainly involved in narcotics activity. And because of that, the officers could infer everybody was, because you wouldn't be in a car at 3 in the morning with two others, two other innocent people. I don't think that logic works here, simply because the hostess implicated herself, made a statement against interest, and essentially admitted she was liable for criminal trespass. It doesn't necessarily follow that she told everybody else that. And I think that singling out is also the difference between Pringle. Peaches essentially explained that she was the reason for the unlawful entry. She had told people that they were invited. She knew, according to Petitioners, that she hadn't concluded the lease yet. She essentially acknowledged, I'm the one who caused this. So I think if there's an analogy to Pringle, it would be 21 friends on a bus, the police find cocaine, and one of them says, that's actually mine, and Petitioners are now saying, well, you can still infer that the other 20 knew about it. Mr. Garrett, I just wanted to get back to Justice Alito's question. I understood that you agreed that it would be acceptable for an officer to make this arrest in a more affluent part of town. Maybe I'm mistaken in that, but because perhaps the furniture situation, one should understand, would be less in this area of town than that area of town, but if it's a new tenant, we all live with folding chairs for a period of time when we move. So does that hold? Is that a fair reason? And should officers really have to distinguish between parts of town in deciding when to make an arrest? I'm sorry if I misspoke, Justice Gorsuch. I'm not trying to argue for some sort of bright-line rule between low-income and high-income properties. I'm saying the Court has repeatedly said, you look at this from a common-sense perspective. And so the new tenant, we all live with boxes, whatever part of town we're from. So does an officer shoot an officer? I mean, red line where he enforces the law? No, no, no, Your Honor. All I'm saying is there are several considerations that could be taken into account in the condition of a property. I think if I was going to make a concession, the concession would be there are certainly situations where the condition of the home will be enough. So Petitioner's cite examples, real-world examples, where there's a big mansion, it's empty because it's being sold, and there's a forced sale sign out front. Now, when the police show up to a teenage party, they obviously have probable cause to arrest at that point, because the forced sale sign, the condition of the house, gives you at least some evidence that. But take away the forced sale sign. We don't have that here. That's not a fact we have. But otherwise, pretty much the same, right? But you say it's okay to arrest at the mansion. No, I think it's – well, again, I think it's different, because in that case, there may likely be forced entry into the home, because they don't have keys to the home. You keep getting facts, and I'm saying keep the facts exactly the same. Just move the house. I'm saying it's a closer case, but if there is some – if the police come upon evidence – Shouldn't I worry that you think it's a closer case, that officers implicitly may distinguish, and you suggest should, based on where in town they're enforcing the law? Well, I think – I think the contrary rule would be very odd. I think it would be very odd for police to take into account certain common-sense considerations sometimes, but ignore the fact that this woman has said she's just moved in or you're in a low-income neighborhood and disregard that. I think police are on the ground, they know their neighborhoods, and that kind of common-sense consideration should – should play into account. Just out of curiosity, who is the bachelor at this bachelor party? It's not clear, but I'm glad you asked, Justice Alito, because the evidence on that is a JA-193, and there's no evidence in the summary judgment record on it. It's a lawyer's statement, we objected to it, and what they actually say, if you read it closely, is that individuals in their depositions were talking about not knowing who the bachelor was, but of course, that is irrelevant. What matters is what the officers learned on the scene. Roberts I hate to keep raising the point, but did you challenge the assertion that they said it was a bachelor party in your brief in opposition? Because they certainly made that point in the petition for summary judgment. Verrilli, No, it wasn't. We agree that they all said it was a bachelor party. I'm sorry. Ginsburg I thought some said it was birthday party. Verrilli, No, Your Honor. That is – that evidence – I mean, that evidence came out at a trial – at the trial after summary judgment. Officer Campanelli changed his story. Kennedy So Peaches is the host of the bachelor party, is that it? Verrilli, Yes. Justice Ginsburg, that evidence came in at trial after the summary judgment was concluded, and in fact, that happened on a couple of occasions where officers changed their story, and we were able to cross-examine them about it and get the officers to effectively admit their memory was better now than two years ago. And I think that, combined with the fact that the police report had a falsity in it, probably added to the damages result here. Oh, the police report states that Officer Parker found marijuana and field-tested it for THC, and Officer Parker acknowledged that was false. Unless there are any further questions, we'll submit. Roberts. Thank you, counsel. Mr. Kim, four minutes remaining.  I agree with your opposing counsel that the wealth of the neighborhood should make a difference, but I suspect that if police officers arrived at a wealthy home and it was white teenagers having a party, and one of them says, my dad just bought this house, that it would be very – and I told the kids they could have a party, and it  I mean, if I said, my dad told me to come and Larry King told me to come and X King told me to come, that those kids wouldn't be arrested, maybe the kid who lied might be, but I doubt very much those kids would be arrested. So how is this case different? Same set of facts. Sparsely furnished, even a little bit dirty, lights are on, that sort of thing. So shouldn't we have a rule that if we're going to require mens rea at all, that police officers should be treating people equally? Absolutely, police officers should treat people equally. My clients take very seriously their obligation to do so, and there's no selective enforcement claim in this case, and with good reason. The officers took their time here, investigated very thoroughly. Twenty-one people in mass arrested for trespassing, for going to a party. Does that feel right? Yes, Your Honor, because first they were responding to a community complaint. The community, this community, took this very seriously. It was an abuse of a vacant home in their community. The officers appropriately took that seriously. He just had keys. We don't know that the – If those partygoers – well, we know there wasn't forced entry. There's no evidence of forced entry, for sure, Your Honor. We don't know that the officers thought that Peaches had keys. But going back to your question, this was a vacant home in the sense that no one was living there, not in any technical district of Columbia law sense. Neighbors had reported this house wasn't supposed to have anybody living there, and that's the type of home that trespassers can target in houses in any socioeconomic status. Mr. Kim, you got up and said you had a few points. Do you want to run through those? Yes, Your Honor. First, just to clean up, the fact that everyone was interviewed was in our petition on page 3 and supported by the record in multiple spots, including page 131 of the Joint Appendix. As to whether or not this – the question of competing motions or summary judgments is properly before the Court at this point, it's not just that they didn't raise the disputes. They affirmably said in their brief in opposition, this is the factual background. And if you look again at page 1 of the brief in opposition, they agree as to the essential factor that the owner had not given permission. There was also a waiver in the Court of Appeals below. Pages 3 to 4 of their brief in the circuit says, here are the essential undisputed facts. It quotes the trial court about that. And finally, I just need to close with a reminder, both questions, both questions here need to be considered from the perspective of the on-scene officers who are trying to do their jobs that night. We put ourselves in their shoes and ask whether what they did was reasonable or at least arguably reasonable. They investigated thoroughly. They had much evidence, circumstantial, but much evidence as to either knowing or at least negligent trespass. Given all that, what they did was reasonable or at least arguably so. They did not have to think that Peaches was the only trespasser that night. Kagan. Kagan. And realizing that this is not the legal question before us, I'm just curious as to what your answer is. If you were giving counsel to the police department and they said in a situation like this, what should we do, a very different question from the legal question before us, but what would be the answer to that question? I think it's difficult. It really depends on the totality of circumstances, just like the Fourth Amendment question does. It's these circumstances. I think community policing is a fraught endeavor with many competing pressures and many competing responsibilities. I am not an expert in that. I would not endeavor, especially in this forum, to answer that question. But again, what we're being asked here is not whether what the officers did was the right decision. There are good arguments why it was. The question is whether we're going to set a nationwide floor that officers may not arrest in circumstances like these. Thank you, counsel. The case is submitted.